Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Nicholas A. West (SBN 309003) *nw@mckennonlawgroup.com*
**McKennon Law Group PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff GUILLERMO IBARRA CORTES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| GUILLERMO IBARRA CORTES,<br><br>                         Plaintiff,<br><br>vs.<br><br>ANTHEM LIFE INSURANCE COMPANY; and DOES 1 through 10, inclusive,<br><br>                         Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>---<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>   -   Civil Cover Sheet;<br>   -   Summons; and<br>   -   Certification of Interested Parties] |

Case No.:



## INTRODUCTION

1.      Plaintiff Guillermo Ibarra Cortes ("Plaintiff") suffers from dementia. He is now suffering from the worst nightmare of the human condition: the slow loss of oneself and the loss of loved ones.  Plaintiff suffers from memory problems, impaired judgment, an impaired ability to concentrate and a diminished ability to solve problems.  Plaintiff also suffers from a post-traumatic stress disorder ("PTSD"), depression and an anxiety disorder.  Because of his conditions, he can no longer work.  Before his conditions rendered him unable to work, he managed a grocery store as a Store Director for Cardenas Markets, Inc. ("Cardenas").  He managed employees, worked with customers, addressed complicated financial matters and performed a variety of other tasks in a hectic environment that often required him to perform multiple tasks at the same time.  Through his work, Plaintiff obtained short-term and long-term disability insurance with Defendant Anthem Life Insurance Company ("Anthem").  Plaintiff filed a claim for disability benefits with Anthem.  Anthem claims that Plaintiff is not disabled.  Anthem erroneously relies on a paper reviewer whose bias in favor of insurance companies is well documented. Furthermore, Anthem casually discounted the opinion of the only psychologist to have examined Plaintiff and an award of Social Security Disability Insurance ("SSDI") benefits.  In light of Anthem's clearly incorrect decision, Plaintiff seeks to compel Anthem to pay Plaintiff the benefits he is owed, together with interest on those benefits and for attorneys' fees and costs of litigation.

## JURISDICTION AND VENUE

2.      Plaintiff brings this action to recover benefits and to enforce and clarify his rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject-

Case No.:

matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

3.      Venue lies in the Central District of California, Eastern Division pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this district, some of the alleged breaches occurred in this district and the ERISA-governed plan at issue was administered in part in this district.

## THE PARTIES

4.      Plaintiff is an individual who, at all times relevant to this action, was a citizen of the State of California and a resident of the City of Winchester in Riverside County.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare benefit plan (the "Plan") established by his former employer, Cardenas, which is at issue in this action.

5.      Anthem, at all times relevant, administered short-term disability ("STD") and long-term disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing group policy number 275015 to Cardenas.  That Plan and its related policies promised to pay STD and LTD benefits to Plaintiff should he become disabled.  Anthem has acted as a claims administrator and as an ERISA claims fiduciary of the Plan.

6.      The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the

-2-

Case No.:



1  true names and capacities of DOES 1 through 10 when the same are ascertained;

2  DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, or

3  employees of said principals, and all of the acts performed by them were within the

4  course and scope of their authority and employment.  Plaintiff is informed and

5  believes and thereupon alleges that each of DOES 1 through 10 is legally

6  responsible in some manner for the events referred to herein, and directly and

7  proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

8

9  **FACTUAL BACKGROUND**

10

11  A.    **The Policy**

12

13  7.    Under the Plan, Plaintiff is covered under both a policy providing STD

14  benefits (the "STD Policy") and a policy providing LTD benefits (the "LTD

15  Policy").  A person must exhaust their STD benefits before they are eligible for

16  LTD benefits.  When Anthem denied Plaintiff's STD claim, it effectively denied any

17  and all claims for LTD benefits.

18

19  8.    The STD Policy defines "Disabled" and "Disability" as follows:

20

21  Disabled and Disability mean during the Elimination Period and
   thereafter because of Your Injury or Illness, all of the following are
22  true:

23  -You are unable to do the Material and Substantial Duties of Your Own
   Occupation; and
24  -You are receiving Regular Care from a Physician for that Injury or
25  Illness; and

26  -Your Disability Work Earnings, if any, are less than or equal to 80%
   of Your Weekly Earnings.

27

28

-3-



**B.    Plaintiff's Occupation and Job Duties**

9.    Plaintiff was a Store Director for Cardenas.  An official job description from Cardenas explains that:

> The Store Director must be able to comprehend, communicate, and implement corporate store strategy and action plans. The Director is responsible for motivating the team to complete the sales process, ensure customer satisfaction, comply with company procedures and federal/state/local compliance and maximize productivity and profitability. The Store Director ensures that each guest receives outstanding customer service by providing a friendly environment, maintaining outstanding store standards, solid product knowledge and all other components of customer service programs. The Store Director will have overall management responsibility for the retail grocery store operation, including store performance, control of cash, inventory, security, customer service, and management of staff.  Must be able to prioritize, plan, and coordinate work activities, manage time and resources so that work objectives are met on a daily basis. Provide constructive suggestions and encouragement, set performance expectations, provide honest feedback, and identify assignments to provide others with development.

10.    In addition to the above, the official job description also explains that a Store Director must:

- Forecast, schedule, and monitor labor to be consistent with store sales and productivity guidelines and wage budgets.
- Create action plan to address cost control issues.
- Communicate sales goals, department performance and sales opportunities for department managers and team members to ensure positive results by setting appropriate expectations.
- Determine marketing and operating strategy changes by reviewing financial statements and departmental sales records with the District Manager and/or other corporate staff.



Case No.:

- Secure merchandise by implementing security systems and measures that enforce loss prevention policy and awareness with employees in order to control shrink.
- Maintain financial and process controls including shrink, labor and operating expenses, to achieve pre-determined performance objectives.
- Ensure all federal, state, local agency, company regulations and standards compliance for product freshness food safety, refrigeration, and sanitation.
- Communicate and collaborate with upper management and corporate staff to make certain facility and equipment are properly maintained to guarantee product integrity and safety for employees and customers.
- Ensure availability of merchandise and services by monitoring contracts and maintaining inventories.
- Market merchandise by studying advertising, sales promotions and display plans.
- Analyze operating and financial statement[s] for profitability ratios.
- Develop, direct and monitor display accuracy and appearance to implement promotions.
- Ensure that products are properly displayed and ordered in a manner to maintain in-stock conditions.
- Focus on customer satisfaction and needs and ensure that employees provide customers with superior customer service through use of best practices and application of formal customer service standards.
- Maintain positive working relationships with direct reports, peers, supervisors, suppliers, and customers by effectively handling complex or difficult situations involving others.
- Motivate and develop teams through training, coaching, counseling, planning, organizing and appraising job results.
- Serve as a role model to others instilling a positive attitude in his/her employees.
- Select, train, develop, and manage job performance of store employees, with assistance of other management personnel.
- Partner with the Human Resources Department in addressing all employee relations issues, recruitment, salary changes, promotions, etc.
- Other necessary and required duties and responsibilities.



### C.   <u>Factual Background of Plaintiff's Claim</u>

11.    Plaintiff began working at Cardenas on August 29, 2008.  As a Store Director, he spent his days actively addressing the wide variety of issues that arise when managing a grocery store, such as those outlined above.  He excelled at that position for 10 years.

12.    Over time, Plaintiff's health began to decline.  Doctors initially had difficulty in diagnosing Plaintiff's health problems.  Two of Plaintiff's complaints were headaches and chest pain.  As a result, a CT scan was performed on August 30, 2018.  The CT scan showed evidence of an "old 3 mm infarct," an obstruction of the blood supply that causes death of local tissue.

13.    Doctors also performed a CT scan and X-ray of Plaintiff's chest on August 29, 2018.  The tests revealed a slightly enlarged heart, a small hiatal hernia and dependent atelectasis.

14.    An August 30, 2018 nuclear cardiac stress test revealed that Plaintiff's heart also suffers from "a large area of permanent damage in the apex" extending to the inferior wall.  There is also "ischemia in the interior wall extending into the lateral wall."  Plaintiff's ejection fraction[1] was calculated at 62% and the damage was rated as moderate to mild.

15.    James Keating, M.D., Plaintiff's primary care physician, examined Plaintiff on multiple occasions.  In his records dated September 14, 2018, Dr.

---

[1] "Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts." Rekha Mankad, M.D., Ejection Fraction: <u>What does it measure?</u>, Mayo Foundation, (June 23, 2020, 10:45 AM), https://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286.

Case No.:



1    Keating noted that Plaintiff suffered from chest pain, anxiety, coronary artery

2    disease and diabetes.  He also noted that Plaintiff was confused and crying.

3

4    16.    On that same date, Plaintiff applied for STD benefits.  At the time,

5    Plaintiff did not fully understand the nature of his disability.  He simply understood

6    that he could not work due to a variety of issues.  On the application, Plaintiff listed

7    a variety of problems, including anxiety, coronary artery disease and chest pain.  In

8    a box labeled "functional impairments" Plaintiff included "confusion, nerves, chest

9    pain."  On that date, Dr. Keating completed a portion of the application and listed

10   Plaintiff's conditions and limitations as identical to those listed by Plaintiff.

11

12   17.    In a follow-up visit on October 3, 2018, Dr. Keating noted that Plaintiff

13   suffered from anxiety, PTSD and major depressive disorder.

14

15   18.    By letter dated October 19, 2018, Anthem approved Plaintiff's claim

16   for STD benefits.  The letter explained that benefits would begin after the end of the

17   STD Policy's elimination period.  It further stated that Plaintiff's STD claim was

18   only approved from August 29, 2018 through October 3, 2018.  If he remained

19   disabled beyond that date, he would need to submit updated medical information to

20   establish his disability.

21

22   19.    On October 29, 2018, Dr. Keating again examined Plaintiff.  Plaintiff's

23   wife had requested a referral to a neurologist and an MRI.  Originally, Plaintiff was

24   planning on putting his résumé online and looking for a new job due to feeling

25   anxiety when thinking about his previous job.  However, given the unusual nature of

26   Plaintiff's behavior, Dr. Keating administered the SLUMS test.  This is a test to

27   determine whether a person suffers from cognitive impairment and dementia,

28   a debilitating and progressive condition.  A score below 20 indicates dementia.

Case No.:



Plaintiff scored 19, in the dementia range.  Based on these results, Plaintiff decided he would apply for Medicare.  He did not further pursue seeking new employment.

20.     Because of his inability to work, Plaintiff applied for and received disability benefits from the State of California.  As part of that claim, on November 1, 2018, Dr. Keating completed an attending physician statement.  In the statement, he explained that Plaintiff is disabled because he suffers from dementia and problems with anxiety.  Dr. Keating further indicated that Plaintiff's disability is permanent.  In explaining how Plaintiff's conditions inhibit his ability to work, Dr. Keating stated that Plaintiff suffers from memory problems, impaired judgment, an impaired ability to concentrate and a diminished ability to solve problems.

21.     On November 27, 2018, Dr. Keating authored a letter in favor of Plaintiff's disability claim.  In the letter, he explained that Plaintiff suffers from dementia (permanent and progressive), diabetes and an anxiety disorder.  He further stated that "Mr. Ibara[sic] is unable to return to work of any kind secondary to the above diagnosis and is to be considered permanently disabled."

22.     On December 18, 2018, Plaintiff applied for SSDI benefits.

23.     On December 27, 2018, in a second attending physician statement and its accompanying Supplement, Dr. Keating explained that Plaintiff suffers from dementia, which causes him to suffer from diminished memory, focus and concentration.  Plaintiff's "cognition" was impaired.  He also explained that Plaintiff had scored in the dementia range with a score of 19/30 on the SLUMS test.  He indicated that Plaintiff is totally disabled and will never again be able to work.  He further emphasized that "dementia is a progressive disability."

-8-

Case No.:



24.     In the Supplement, Dr. Keating completed a form, listing Plaintiff's functional capacity to perform various tasks.  He noted that Plaintiff suffers from impairment in every category inquired about by Anthem.  With the exception of "respond appropriately to supervision," which was noted to be mildly impaired, all other categories were labeled as being impaired to a moderate or moderately severe degree.  The form defines moderate impairment as "Impairment affects but does not preclude ability to function."  Moderately severe is defined as "Impairment significantly affects ability to function."  Of note, four categories were labeled as being impaired to a moderately severe degree.  Those categories were: "perform intellectually complex tasks requiring higher levels of reasoning, math and language skills," "makes independent judgments," "supervise or manage others," "perform under stress when confronted with emergency, critical, unusual or dangerous situations; or situations in which working speed and sustained attention are make or break aspects of the job."  All of these categories are very important to the duties of a Store Director.

25.     On February 26, 2019, Anika Holness, an Anthem employee, completed a behavior health review of Plaintiff's medical records.  The entirety of the resulting report states:

> MR records do not support that EE is disabled from the dimentia [sic]. 10/03/2018 OV notes indicates EE reported his job is a major problem and he developed ptsd from the job with anxiety. He reported that he is going to look for another job. Reported performing all ADL's at home on his own. There is no mention of cognitive deficits.
> The MR do not support a severity of sx that would preclude EE from working.

26.     By letter dated March 29, 2019, Anthem terminated Plaintiff's claim for benefits in a mere two pages.  The letter stated:

-9-



Your claim file was reviewed by our clinical staff on February 26, 2019.  Based on the information received, we are of the opinion that although you may experience symptoms related to dementia, the medical records received do not support your claim for continued Short Term Disability (STD).  You're[sic] attending Physician reported that you have been performing all of your activates [sic] of daily living at home on your own and there has been no mention of any cognitive deficits.  The medical records do not support a severity of symptoms that would preclude you from performing your normal job functions.

27.     On May 16, 2019, Plaintiff underwent an Independent Medical Examination ("IME") for the Social Security Administration.  He was examined by Clifford Taylor, Ph.D.  In the IME report, Dr. Taylor noted that Plaintiff's chief complaints were dementia and anxiety.  Plaintiff further described his symptoms as anxiety, fearfulness and crying spells.  He also reported difficulty in completing tasks and forgetting tasks that needed to be completed, including some activities of basic daily living.  For example, Plaintiff required assistance in completing the forms for the IME.  He said that he suffered from serious and constant "depression, anxiety, head injury, memory problems, fatigue, problems with concentration/ attention, and medical problems."

28.     The IME report includes the result of extensive testing.  It includes the various test scores and subsequent interpretation.  It is a comprehensive assessment.

29.     The IME report also noted that, at the IME, Plaintiff was anxious and sad and "cried profusely throughout the evaluation."  He had a constricted, sad and tearful affect.  He also "appeared to give effort in a manner consistent with his ability on testing tasks."  Additionally, he had difficulty in thinking of desired words and "had difficulty getting to the point."  The IME report also noted he had difficulty with certain activities of daily living including cooking, making snacks, he is forgetful regarding daily tasks and needs help from his wife with financial

-10-



1   management.  It explained that he "often gave irrelevant details and explained

2   himself excessively" and "had trouble finding words."

3

4       30.    Ultimately, the IME report notes moderate impairment for a variety of

5   tasks, including complex work tasks, the ability to concentrate and focus on work

6   activities, the ability to stay on task at a sustained rate and the ability to persist and

7   maintain pace.  The IME report also notes impairment in his ability to complete

8   simple work tasks, carry out instructions, interact with supervisors and coworkers

9   and regulate emotions.  Dr. Taylor diagnosed Plaintiff with an unspecified

10  neurocognitive disorder and an unspecified anxiety disorder.

11

12      31.    Based on the IME report, the Social Security Administration approved

13  Plaintiff's claim for benefits.

14

15      32.    On May 13, 2019, Plaintiff contacted Anthem, seeking information

16  about LTD benefits.  The two parties exchanged emails over the course of several

17  days.  Ultimately, in an email dated May 29, 2019, Stephanie Jones, a Disability

18  Case Manager II, stated that "Because further STD benefits have been denied this

19  claim would not transition into LTD.  There is no LTD denial, as the STD claim

20  benefits have [not] been exhausted.  LTD cannot be addressed until STD benefits

21  have been exhausted."

22

23      33.    Plaintiff's medical records from his July 1, 2019 visit with Dr. Keating

24  document how quickly Plaintiff's general condition had degenerated:

25

26      Has problems with concentration and mood swings.  Still having
    emotional instability.  Forgot to lock horses in the stables recently.
27  Locks himself in so he remembers to stay on the property.  Forgets to
    eat sometimes.  Has to be told to come back in at end of night.
28

-11-



Not getting tearful as much.  Annoyed and frustrated and short fuse
types.  Seems to have problems completing tasks cannot focus as well
as he should.  No problems recognizing people.  Daughter calls to do
checklist with him to be sure he did things.  Has alarms for meds and
has to organize with lists to accomplish things.

34.    On July 8, 2019, via email, Plaintiff appealed the termination of his
STD benefits.  In the appeal email, Plaintiff explained that further testing had
revealed that Plaintiff suffered from dementia and that not only had that condition
been confirmed by Dr. Keating's testing, but it was further confirmed by a
psychologist, Dr. Taylor.[2]  The appeal further explained that Plaintiff had been
started on a variety of Alzheimer's disease and anxiety medications in addition to
his heart and diabetes medications.  Finally, it explained that:

On a daily basis Guillermo has to be reminded to bathe, eat, hydrate,
stimulate his mind, take his medications, and go to sleep. Alison comes
home every lunch hour to ensure he's okay and his children check in
with him daily to ensure he's safe.

35.    On August 6, 2019, Anthem hired Dane Street, who in turn hired Elana
Mendelssohn, Psy.D., to perform a paper review of Plaintiff's medical records.  Dr.
Mendelssohn concluded that "The clinical evidence does not support the diagnosis
of dementia" and that Plaintiff was not disabled.

36.    As part of her basis for concluding that Plaintiff did not have
restrictions and limitations, Dr. Mendelssohn claimed that Dr. Keating "stated in the
peer to peer consultation that by March 2019 the claimant's performance on the

---

[2] As noted above, Dr. Taylor's diagnoses were actually unspecified neurocognitive
disorder and unspecified anxiety disorder.  Plaintiff's appeal was technically
incorrect in stating that Dr. Taylor had diagnosed him with dementia, although he
was diagnosed with a severe neurocognitive problem and Dr. Taylor recommended
an award of SSDI benefits based thereon.

Case No.:



cognitive screening measure had improved and he questioned the diagnosis of dementia versus anxiety." There are two problems with this statement. First there is absolutely no documentary proof that this conversation ever occurred. It is a common practice to send a confirmation letter after such peer-to-peer conversations. In this case, no such letter was sent. In light of Dr. Mendelssohn's connection to the insurance industry, as alleged below, this failure to follow up and provide Dr. Keating with a chance to refute or confirm this alleged conversation renders Dr. Mendelssohn's recitation of events improper and very suspect. Second, in May 2019, **after the March date provided by Dr. Mendelssohn**, Dr. Taylor confirmed Plaintiff's disability based on his significant medical conditions. Furthermore, even Dr. Mendelssohn's questionable recitation of her conversation with Dr. Keating does not state that Dr. Keating supports Anthem's position. Even her version of events merely alleges that Dr. Keating is uncertain about the basis of the disability.

37.    Dr. Mendelssohn also criticized the fact that Plaintiff had not been referred to a treating neurologist by Dr. Keating. However, when Dr. Keating asked whether she wanted him to do so, she responded that "it was not my role to make treatment recommendations." She then used this lack of referral as alleged evidence that Plaintiff is not disabled. When Anthem relied on this recommendation without communicating to Plaintiff that it required such a referral, it failed to engage in a full and fair review of Plaintiff's claim.

38.    In connection with an appeal, an ERISA plan administrator must provide a "full and fair" review, which requires that the administrator engage in a meaningful dialogue with the participant. In *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011), the Ninth Circuit explained that a "full and fair" review requires that an insurer "conform to the claim procedure required by statute and regulation," and "explain, upon denial, any 'additional

Case No.: 

information needed'" to support a claim for benefits.  In finding that the administrator's procedural violations failed to meet the standard of review on appeal, the *Salomaa* Court explained how a claims administrator can violate the obligation to provide a "full and fair" review:

> The administrator's procedural violations are similar to those in *Saffon v. Wells Fargo & Company Long Term Disability Plan* and *Booton v. Lockheed Medical Benefit Plan*.  There, as here, the administrator did not provide material sufficient to meet the requirement of "meaningful dialogue."  We held in those cases, where the denials were based on absence of some sort of medical evidence or explanation, that the administrator was obligated to say in plain language what additional evidence it needed and what questions it needed answered in time so that the additional material could be provided.  **An administrator does not do its duty under the statute and regulations by saying merely "we are not persuaded" or "your evidence is insufficient."  Nor does it do its duty by elaborating upon its negative answer with meaningless medical mumbo jumbo**.  *Id.* at 680. (Emphasis added).

39.    **Here, Dr. Mendelssohn, and Anthem did what *Salomaa* precludes, essentially stating "your evidence is insufficient," even when directly asked the appropriate question**.  This is clear evidence of Anthem's failure to comply with applicable law addressing the requirements of a "full and fair" review of an ERISA disability claim.

40.    One of Dr. Mendelssohn's major criticisms of Plaintiff's disability claim is that "a thorough neurological and neuropsychological workup has not been completed.  . . . Typically, a diagnosis of dementia is based on extensive testing, as opposed to an isolated cognitive screening measure which does not include validity measures nor does it provide a comprehensive assessment of cognition to assist in diagnosis differentiation."  The problem with this criticism is that Plaintiff's disability was confirmed by Dr. Taylor.  Dr. Taylor's IME report contains the exact



type of analysis that Dr. Mendelssohn demanded.  At the time of Dr. Mendelssohn's initial report, she had not yet seen the IME report.  The report was subsequently provided to Anthem, which, in turn, provided a copy of the report to Dr. Mendelssohn on August 2, 2019.

41.    Upon receipt of the IME report, Dr. Mendelssohn provided an addendum to her report.  In the addendum, she concluded that "the information does not clearly substantiate impairment."  Even though Dr. Taylor had recommended an award of SSDI benefits, Dr. Mendelssohn never attempted to acquire more information.  Furthermore, Dr. Mendelssohn specifically ignored key portions of the report.  Dr. Mendelssohn dishonestly stated that "the examiner indicated mild impairments related to instructions, interacting with others, concentration/focus, and ability to adapt[.]"  That statement was false.  In fact, the testing showed that Plaintiff's ability to follow instructions and ability to concentrate/focus were moderately impaired.  When something was mildly impaired, the report said so.  The specific use of a much stronger adjective means precisely what it implies: the degree of impairment is significantly more severe.  This active mischaracterization of the contents of the medical records was an egregious attempt by Dr. Mendelssohn to mischaracterize the assessment of a neutral qualified psychologist who diagnosed Plaintiff.

42.    Dr. Mendelssohn's addendum ignored Dr. Taylor's notation of Plaintiff's impairment in several activities of daily living.  He did not in any manner evaluate the IME's testing and results in any analytical manner.  His reports were cursory and conclusory and therefore should not have been given any weight.

Case No.:



43.    The IME report alone was sufficient proof that Dr. Mendelssohn, or Anthem, should have attempted to obtain more information or approved the claim. But neither did so.

44.    Even when presented with the very proof that she had previously said would be sufficient, Dr. Mendelssohn parroted a simple and dishonest answer that Anthem would prefer.  Dr. Mendelssohn did not attempt to obtain more information because that would have impeded her ability to try to do what she does best: provide a basis for insurance companies to deny claims.

45.    Dr. Mendelssohn's relationship and attachment to the insurance industry is well documented.  A simple search on Westlaw's legal research system revealed a total of 64 cases that mention Dr. Mendelssohn being used as a peer reviewer.  Of those, she sided with the insurance company all but three times.  In fact, Dr. Mendelssohn used to work directly for Aetna Life Insurance Company as an "in-house" peer reviewer performing reviews of disability claims.  *See Hoarder v. Bristol-Myers Squibb Co. Long Term Disability Plan*, 281 F.Supp.3d 939, 947-48 (C.D. Cal. 2017) ("Dr. Elana Mendelssohn, an **Aetna in-house psychologist**, participated on Aetna's appeal committee and also reviewed the file.").

46.    Dr. Mendelssohn, and the vendor through which the Anthem retained her, Dane Street, LLC, are Anthem's paid consultants used repeatedly by it in the past to give disability opinions.  Dane Street caters to the insurance, employer and third-party claim administrator industry according to its Website.[3]  It even brazenly markets on its Website, "Our disability-specific panel and clinical team work to understand the claimant's overall functionality and capabilities **with a clinical focus**

---

[3] *See http://site.danestreet.com/.*

-16-

Case No.:



**on Return to Work** . . . ."[4] (Emphasis added.)  A court will review the Defendants' claim denial with skepticism because it relied on financially conflicted, biased consultants who are sold out to the insurance and employer industry.  *See Demer v. IBM*, 835 F.3d 893, 901-03 (9th Cir. 2016); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).

47.     Paper reviewers like Dr. Mendelssohn are precisely why the Ninth Circuit criticized such reliance on paper reviews over the opinions of treating physicians.  *See Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009) ("Another factor is Hartford's decision to conduct a 'pure paper' review in this case . . . .").  An administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." *Michaels v. Equitable Life Assur. Soc.*, 305 F.App'x 896, 906-07 (3d Cir. 2009).

48.     **Every doctor who has physically examined Plaintiff has concluded that he has serious cognitive problems and is disabled**.

49.     On August 21, 2019, Anthem denied Plaintiff's appeal.  The denial of appeal placed overwhelming emphasis on Dr. Mendelssohn's report.  It also placed emphasis on the unsubstantiated statements ascribed to Dr. Keating that allegedly question whether Plaintiff has dementia.

50.     Even when presented with the award of SSDI benefits, Anthem did not change its position.  Anthem simply discounted the award and the IME report.  It erroneously claimed that differences  between the standards in the STD Policy and those in the SSDI requirements may be to blame, when, in fact, in order to receive

---

[4] *See* http://site.danestreet.com/disability/.



SSDI benefits, **Plaintiff had to establish inability to perform *any* occupation and entitlement to benefits under a more demanding standard**.

51.    Anthem failed to meaningfully distinguish the SSA's disability finding in its termination letter pursuant to 29 C.F.R. Section 2560.503-1 (j)(6)(i)(C), which requires that insurers provide "an explanation of the basis for disagreeing with or not following . . . [a] disability determination regarding the claimant presented by the claimant to the plan made by the Social Security Administration." Anthem failed to meaningfully explain its basis for disagreeing with or not following the SSA's disability finding and thus will not be deemed to have provided Plaintiff with a reasonable opportunity for a full and fair review of his claim.

52.    The SSA's determination is strong, almost insurmountable evidence that Plaintiff cannot perform the material duties of her own regular occupation, contrary to what Prudential concluded. *See Rouleau v. MetLife Life Assurance Co. of Boston*, 2017 WL 359466, at *7 (W.D. Mich. Jan. 25, 2017) ("In its de novo review, the Court weighs the SSA determination heavily."); *see also Montour, supra*, 588 F.3d at 635 (While ERISA plan administrators are not bound by the SSA's disability determination, the Ninth Circuit warned that "not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence.")

53.    In an attempt to comply with *Montour, supra*, Anthem briefly and in the most cursory manner explained in its final denial why its benefits decision differed from that of the SSA. Its explanation lacked any detail, meaningful analysis or logic. Anthem's superficial attempt to distinguish the SSA's finding is unpersuasive. failed to explain why its Policy allowed it to arrive at a different result than the SSA, violating Ninth Circuit law. *See Montour*, *supra*, 588 F.3d at 635; *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011).

Case No.:



Anthem summarily dismissed the SSA's disability finding without any meaningful analysis. It's trivial analysis was improper. *See Black v. Hartford Life Ins. Co.*, 2019 WL 2422481, *10-12 (D. Oregon, June 10, 2019) (awarding benefits and finding insurer abused discretion because it failed to meaningfully explain why the SSA's disability finding did not mean the claimant was also disabled under its policy, vaguely stating only that the disability standards were different); *Lin v. Metropol. Life Ins. Co.*, 2016 WL 4373859, *9-10 (N.D. Cal. Aug. 16, 2016) (same); *Mendez v. FedEx Express*, 2016 WL 4429598 *1, 5 (E.D. Mich. Aug. 22, 2016) (insurer's casual mention of SSA's contrary disability determination without explaining why it arrived at a different result and without carefully contrasting the disability standards tends to show arbitrary, incorrect decision abusing insurer's discretion).

54.    Plaintiff is now and at all times relevant has remained "disabled" as defined in the Plan, and has at all times relevant convincingly demonstrated his total disability through medical records and other documents, information and correspondence.

55.    The August 21, 2019 denial letter further explains that Plaintiff has "the right to bring action in federal court under ERISA Section 502(a)(1)(B). Your plan allows for the right to bring action within three years from the date of the final decision, or through approximately August 22, 2022."

## **FIRST CLAIM FOR RELIEF**

**To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest under ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)**
(Plaintiff against Anthem and Does 1 through 10)

Case No.:



56.     Plaintiff incorporates the previous paragraphs as though fully set forth herein.

57.     ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan and/or to clarify his rights to future benefits under the terms of a plan.

58.     At all times relevant, Plaintiff has been entitled to STD and then LTD benefits under the Plan.  By denying Plaintiff's claim for STD benefits under the Plan, and by related acts and omissions, Anthem violated, and continues to violate, the terms of the Plan and Plaintiff's rights thereunder.  By denying Plaintiff's claim for STD benefits, Anthem also denied Plaintiff's claim for LTD benefits.

59.     Anthem has failed to follow even the most rudimentary claims-processing requirements of ERISA and of the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, an action required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in Anthem to make benefit determinations, no deference is warranted with regard to Anthem's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

60.     A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. §1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. § 1104(a)(1).  Under ERISA: (1) a fiduciary

-20-



1   must fulfill its duties solely in the interest of plan participants and beneficiaries and

2   for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act

3   with care, skill, prudence and diligence; and (3) a fiduciary may not act in any

4   capacity involving the Plan, on behalf of a party whose interests are adverse to the

5   interests of the Plan, its participants or its beneficiaries.  Anthem's handling of

6   Plaintiff's disability benefit claim falls far short of these standards.

7

8       61.    For all of the reasons set forth above, Anthem's decision to deny

9   disability insurance benefits to Plaintiff was arbitrary, capricious, wrongful,

10  unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan

11  and contrary to law.  Anthem abused its discretion in deciding to deny this claim, as

12  the evidence shows that its denial decision was arbitrary and capricious.  Further,

13  Anthem's denial decision and related actions heighten the level of skepticism with

14  which a court views a conflicted administrator's decision under *Abatie v. Alta*

15  *Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life*

16  *Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  Anthem's denial of Plaintiff's claim

17  constitutes an abuse of discretion.

18

19      62.    As a direct and proximate result of Anthem's denial of disability

20  benefits, Plaintiff has been deprived of STD and LTD benefits since October 29,

21  2018.

22

23      63.    As a direct and proximate result of the denial of his claim for STD and

24  LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this

25  action and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section

26  1132(g)(1).

27

28

Case No.:



64.     A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the STD Policy and therefore entitled to disability benefits. Plaintiff seeks the declaration of this Court that he meets the STD Policy's definition of disability and is entitled to benefits under the STD and LTD Policies. In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim that is consistent with the terms of the policies.

65.     Plaintiff alleges all of the same conduct against Does 1 through 10 that it does against Anthem in this First Cause of Action and in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.     For all Plan benefits due and owing Plaintiff, including STD and LTD benefits.

2.     For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g).

3.     For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred.  *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code Section 10111.2.

Case No.:



1     4.    For such other and further relief as this Court deems just and proper.

2

3   Dated:  August 10, 2020                    **McKENNON LAW GROUP PC**

4

5                                        By:

6                                           ROBERT J. McKENNON
                                            NICHOLAS A. WEST
7                                           Attorneys for Plaintiff,
                                            Guillermo Ibarra Cortes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Case No.:



## CERTIFICATE OF SERVICE

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 20321 SW Birch St., #200, Newport Beach, California 92660; Fax 949-385-5165; E-mail address: dc@mckennonlawgroup.com.

I hereby certify that on Click here to enter a date., I served the foregoing documents described as:  on the interested parties as follows:

[Insert]

Attorneys for [Insert]
☐ ECF Participant

☐ **ECF/CM:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System.  I served those parties who are not registered participants of the ECF System as indicated below.

☐ I placed the ☐ original ☐ a true copy thereof enclosed in sealed envelope(s) to the notification address(es) of record and caused such envelope(s) to be delivered by ☐ **FIRST-CLASS MAIL** ☐ **OVERNIGHT DELIVERY**.

☐ **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the notification electronic mail address(es) of record before close of business for the purpose of effecting service and the transmission was reported as complete and without error.

☐ **FACSIMILE:** Based on ☐ courtesy ☐ court order ☐ agreement of the parties, I caused a true copy thereof to be served by transmitting via facsimile machine to the notification facsimile number(s) of record before close of business.   The transmission was reported as complete, without error.

☐ **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered by hand to the notification address(es) of record by an employee or independent contractor of a registered process service.

I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct.  Executed at Newport Beach, California on Click here to enter a date..

NAME: _____

(Signature)

DOCUMENT1

Case No.: